# COURT OF APPEALS
## DECISION
## DATED AND FILED

## April 20, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos. **2020AP505**
**2020AP506**

Cir. Ct. Nos. **2018CV528**
**2016PR115**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

NO. 2020AP505

NATHAN VER VELDE, JACOB VER VELDE, MATTHEW VER VELDE, MICHAEL VER VELDE AND GARRETT VER VELDE,

PLAINTIFFS-APPELLANTS,

V.

JEFFRY VER VELDE,

DEFENDANT-RESPONDENT.

---

NO. 2020AP506

IN RE THE ESTATE OF MARILYN Y. VER VELDE:

NATHAN VER VELDE, JACOB VER VELDE, MATTHEW VER VELDE, MICHAEL VER VELDE AND GARRETT VER VELDE,

APPELLANTS,

V.

**JEFFRY VER VELDE,**

   **RESPONDENT.**

___

APPEALS from an order of the circuit court for Sheboygan County: ANGELA W. SUTKIEWICZ, Judge. *Affirmed in part and reversed in part*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. In these consolidated probate and civil cases, Nathan, Jacob, Matthew, Michael, and Garrett Ver Velde appeal from an order entered in favor of their uncle, Jeffry Ver Velde. The Ver Velde brothers claim the circuit court erred when it: (1) denied their petition to remove Jeffry as personal representative for Marilyn Ver Velde (their grandmother and Jeffry's mother); (2) dismissed their civil Complaint against Jeffry that asserted Jeffry breached his fiduciary duty, improperly disposed of Marilyn's personal property, and failed to keep required accounting records; and (3) found their motion to remove Jeffry as personal representative frivolous. For the reasons that follow, we affirm that part of the circuit court's order denying the Ver Velde brothers' petition for removal of Jeffry and the dismissal of their civil Complaint; however, we reverse the part of the circuit court's order finding the Ver Velde brothers' actions to be frivolous. We vacate that portion of its order and direct that all monetary sanctions paid pursuant to it, if any, shall be refunded.

¶2     These cases arise from litigation following the death of Marilyn Y. Ver Velde in December 2016. Marilyn was the mother of Jeffry and Joseph Ver Velde. Joseph is the father of the five Ver Velde brothers.

¶3     In 2006, Marilyn executed a Will leaving half of her estate to Jeffry and the other half to be held in trust by Jeffry for the five Ver Velde brothers. Marilyn designated Jeffry as personal representative, conferring him with broad authority.[1] Marilyn intentionally excluded Joseph from her Will.

¶4     Eight years later, in 2014, Marilyn executed a durable power of attorney appointing Jeffry as her attorney-in-fact. Again, the document granted Jeffry broad authority in managing Marilyn's financial affairs.[2]

¶5     In June 2016, Marilyn fell and broke her femur. As a result of her injuries and cognitive difficulties, she was admitted to a nursing home. Thereafter, Jeffry managed all of her financial affairs.

---

[1] The Will provided the personal representative the following authority:

> I hereby authorize and empower him, at any time, to sell, exchange, assign, transfer, or otherwise dispose of any real or personal property belonging to my estate, without first obtaining the order of said Court, and authorize him to execute and deliver any and all necessary instruments of transfer and deeds of conveyance.

[2] Under paragraph 4 of the durable power of attorney, Jeffry had the following authority:

> To maintain, repair, improve, manage, insure, rent, lease, sell, convey, subject to liens, mortgage, subject to deeds of trust, and hypothecate, and in any way or manner deal with all or any part of any real or personal property whatsoever, tangible or intangible, or any interest therein, that I now own or may hereafter acquire, for me, in my behalf, and in my name and under such terms and conditions, and under such covenants, as said attorney in fact shall deem proper[.]

¶6     The next month, while attending their father's funeral, Jeffry informed Joseph that he planned to sell Marilyn's house as she would not be returning to it. He provided a key to Joseph[3] and told him that he and the five brothers (Joseph's sons) could take whatever they wanted from the house, as it needed to be cleaned out before sale.

¶7     In September 2016, Jeffry hired Ted Scharl, a professional appraiser and realtor, to appraise Marilyn's house. Scharl determined the value of the house to be $160,000 as of July 2016.

¶8     Joseph and his five sons did not remove any property from Marilyn's house or help clean it out. As a result, in late October-early November 2016, Jeffry donated the contents of the house to a charity with the exception of some furniture requested by Luke Gartman. Gartman was a neighbor of Marilyn's and had previously expressed interest in purchasing the house.

¶9     In November 2016, Jeffry accepted Gartman's offer to purchase Marilyn's house "as is" for the sum of $155,000.[4] This was consistent with Marilyn's instruction to Jeffry, before she left her home, to offer the house to Gartman at a fair price. The sale was done without a realtor, thereby saving the cost of commission.

¶10     After Marilyn's death, Joseph attempted to admit into probate a codicil, which would have made him the trustee of his five sons' 50% share of the

---

[3] Joseph testified that it was Marilyn, rather that Jeffry, who gave him the house key, but the circuit court believed Jeffry's testimony and specifically found that Jeffry provided Joseph with the key.

[4] The house needed updates and included an original septic system, an old 275-gallon fuel oil tank in the basement that had to be removed, and flooring that may have contained asbestos.

estate. The circuit court refused Joseph's request, finding that the codicil was the result of undue influence. This court summarily affirmed that decision. ***Joseph G. Ver Velde v. Estate of Marilyn Y. Ver Velde***, No. 2018AP250, unpublished op. and order (WI App May 15, 2019).

¶11 While Joseph was litigating his case, the Ver Velde brothers petitioned to have Jeffry removed as personal representative. They also commenced this separate civil action in which they accused Jeffry of breaching his fiduciary duty while acting as Marilyn's attorney-in-fact. The Ver Velde brothers also asserted claims for conversion and an accounting of Jeffry's disposition of Marilyn's personal property. The Ver Velde brothers challenged the manner in which Jeffry performed his duties. They alleged that he failed to include assets and liabilities in his accounting documents filed in the probate matter. They alleged that Jeffry disposed of or kept for himself the furnishings and other contents of Marilyn's home without compensating the Ver Velde brothers who were 50% heirs under the Will.

¶12 The circuit court held a joint hearing/trial on all issues in both cases. The circuit court first heard testimony from Kenneth Sonntag, whom Joseph hired to appraise Marilyn's house; Ty Conrad, a realtor Joseph hired to do a market analysis on Marilyn's house; and appraiser Scharl. Then, three of the five Ver Velde brothers testified: Nathan, Matthew, and Jacob. Nathan testified about the furniture and personal property that had been in Marilyn's house and how he and his brothers tracked down the furniture at a thrift shop and purchased some of it. Nathan also testified about receiving the Inventory Jeffry filed in the probate matter and noticing that it did not list any of Marilyn's furniture, personal property, or jewelry. When he asked Jeffry about it, he was told "most of it was junk" and "even thrift stores would not accept it," which he later discovered was untrue. Further, he denied that

5

Jeffry or Joseph ever told him he could go to Marilyn's house and take whatever property he wanted.

¶13 Matthew testified next and described a time during the summer of 2015 when he was visiting Marilyn's house, and they were talking about his grandfather's war memorabilia when Marilyn showed him an heirloom ring which she said was very sentimental to her but that she did not wear because it was worth $20,000 to $25,000. He testified Marilyn did not mention giving the ring to anyone. Matthew also testified about the furniture in Marilyn's house and how he located some of her furnishings at a thrift shop and purchased some of it. He also identified the pictures in Exhibit 7, which depicted Marilyn's furniture in her home and some that had been moved to her garage.

¶14 Then Jacob testified. He explained he was also at Marilyn's house when she brought out the heirloom ring and testified about seeing Marilyn's furniture in her garage around Thanksgiving 2016. At that time, Jacob had expressed interest in some of the furniture and asked Joseph if he could have it, but Joseph said they would have to ask Jeffry. The circuit court then heard testimony from Joseph, Jeffry, and Jeffry's wife, Robin.

¶15 Following two days of testimony, the circuit court found Jeffry and Robin to be "very credible[.]" It also found that Jeffry "ha[d] done a very good job." In contrast, the circuit court found Joseph and the three Ver Velde brothers who testified to not be credible and said their version of events was "just not believable[.]" The court then denied the Ver Velde brothers' petition and dismissed their civil action, concluding that Jeffry had acted in good faith as personal representative and did not breach his fiduciary duty while acting as attorney-in-fact. The court went further, however, and ordered the Ver Velde brothers to show cause

6

as to why they should not be sanctioned for filing and continuing to pursue their claims in violation of WIS. STAT. § 802.05(2)(a) and (c) (2019-20).[5] After a hearing to show cause, the court ruled that the Ver Velde brothers' petition and civil action were frivolous and imposed a monetary sanction. This appeal follows.

¶16 On appeal, the Ver Velde brothers contend that the circuit court erred in denying their petition and dismissing their civil action. Again, they accuse Jeffry of breaching his duties as personal representative and attorney-in-fact. They also insist that their petition and civil action were not frivolous.

¶17 With respect to the first argument, we are not persuaded that the circuit court erred in denying the petition and dismissing the civil action. To begin, Jeffry had broad authority for doing what he did under the Will and durable power of attorney. As power of attorney, Jeffry had broad discretion to "manage … sell, convey … and in any way or manner deal with all or any part of any real or personal

---

[5] Section 802.05(2)(a) and (c) state as follows:

> (2) **Representations to Court**. By presenting to the court, whether by signing, filing, submitting, or later advocating a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, all of the following:
>
> (a) The paper is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
>
> ….
>
> (c) The allegations and other factual contentions stated in the paper have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

property whatsoever, tangible or intangible, or any interest therein … as said attorney in fact shall deem proper[.]" Jeffry cleared out Marilyn's house *before* she died and while acting as her power of attorney. Jeffry testified that he deposited the proceeds from any property that he sold, including Marilyn's car and a lawn tractor, into Marilyn's account. He decided to give away Marilyn's furniture because he had given Joseph and his sons the chance to take what they wanted, but they never did. Jeffry testified that he had contacted St. Vincent de Paul and Goodwill, and neither place would take the furniture. He did not see an estate sale as "a great return on investment either[.]" As he was "going down the list of charitable organizations[,]" he found one, "Bethesda," who agreed to take much of the furniture. Bethesda sent a truck to the home on October 31, 2016.

¶18     The circuit court found Jeffry's actions in disposing of the contents of Marilyn's house reasonable and consistent with his authority as her power of attorney and personal representative. It found that Jeffry disposed of this personal property only after giving Joseph and his sons several months to go to Marilyn's house and take whatever property they wanted. Moreover, the circuit court's decision arose from its credibility findings after hearing the testimony from all the witnesses. It found Jeffry's testimony "very credible" in his account of how he used his authority. By contrast, it found the Ver Velde brothers' version not credible and "just not believable[.]"

¶19     Generally, we will not overturn credibility determinations on appeal, and we see no reason to do it here. *See **Global Steel Prods. Corp. v. Ecklund Carriers, Inc.**,* 2002 WI App 91, ¶10, 253 Wis. 2d 588, 644 N.W.2d 269. The record shows that Jeffry sold Marilyn's house at a price near his appraiser's estimated value and offered an opportunity to Joseph and his sons to take property from the house before disposing of it. Additionally, Jeffry provided reasonable

explanations for cash withdrawals from Marilyn's account[6] and the failure to include all of the estate's assets in the original inventory.[7] Collectively, this was sufficient to show that he acted in good faith and did not breach his fiduciary duty.

¶20    As for the Ver Velde brothers' second argument, a claim is frivolous if it is not well grounded in fact or law. *Industrial Roofing Servs., Inc. v. Marquardt*, 2007 WI 19, ¶75, 299 Wis. 2d 81, 726 N.W.2d 898, *clarified on reconsideration*, 2007 WI 62, 301 Wis. 2d 30, 731 N.W.2d 634 (per curiam). "Our review of [a] [circuit] court's decision that an action was commenced frivolously is deferential." *Keller v. Patterson*, 2012 WI App 78, ¶21, 343 Wis. 2d 569, 819 N.W.2d 841.

> Determining what and how much pre-filing investigation was done are questions of fact that [are] upheld unless clearly erroneous. The determination as to how much investigation should have been done is also a matter within the [circuit] court's discretion. The [circuit] court's discretionary decisions will be sustained so long as the [circuit] court "examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.

*Id.* (citations omitted).

---

[6] Although Jeffry could not remember all of the cash withdrawals, he recalled using some to pay for the funeral dinner and the dumpster to clean out Marilyn's house. He denied pocketing the money or using it for anyone other than Marilyn.

[7] For example, Jeffry acknowledged that he forgot to include Marilyn's jewelry in the original inventory. The circuit court found that one disputed ring did not belong in the inventory, as it was given to Robin in 2012. It further found that the remaining jewelry, valued at $236, should have been included. Jeffry immediately amended the inventory to include the jewelry.

Jeffry also did not include a $10,000 debt owed by Joseph to Marilyn in the original inventory. He explained that he was unsure he would collect it because it was a family debt. At any rate, the matter was litigated in another case, and Jeffry indicates he will be either filing an amended inventory showing the $10,000 debt or showing it as added property on the final account.

¶21     Whether the decision to continue litigating a claim is frivolous turns on whether an attorney or party knew or should have known that the position was frivolous, which is measured by what a reasonable attorney or party would have known or should have known under the same or similar circumstances.  *Ivancevic v. Reagan*, 2013 WI App 121, ¶27, 351 Wis. 2d 138, 839 N.W.2d 416; *see also Sommer v. Carr*, 99 Wis. 2d 789, 799, 299 N.W.2d 856 (1981) (applying objective standard to parties).  Whether facts found by the circuit court support a finding that claims lacked a basis in law or fact is a question of law which we review de novo. *Id.*  All doubts on the issue of frivolousness must be resolved in favor of the party against whom sanctions are sought.  *Id.*

¶22     Applying these standards here, we do not believe the record supports the circuit court's decision to impose sanctions.  First, as to the Ver Velde brothers' conduct in filing the petition to remove Jeffry as personal representative and in the breach of fiduciary duty and other claims, the circuit court did not make findings of fact as to the pre-filing investigations each Ver Velde brother undertook.  It also did not make findings as to how much investigation should have been done.  Second, as to the continued litigation of the claims, the circuit court did not make findings as to what a reasonable person in the Ver Velde brothers' shoes would have or should have known about their evidentiary support or lack thereof.  Here, the record shows that much of the communication occurred between Jeffry and Joseph on the one hand and Joseph and his five sons on the other hand.  It is unclear whether Jeffry communicated directly with the Ver Velde brothers at all before this litigation or simply trusted Joseph to share the pertinent information.

¶23     The circuit court's findings related to the issue of sanctions focused not on what each brother knew or should have known, but instead on the role played by the Ver Velde brothers' father, Joseph, a nonparty, in bringing the claims against

Jeffry. At the conclusion of trial, the circuit court recounted that Joseph had misrepresented the status of Marilyn's home to an appraiser who testified for the Ver Velde brothers in order to obtain an appraisal, which resulted in the appraiser believing the house (which Jeffry had already sold) was on the market and locating a potential buyer, an act the court said "would shock the conscience of any good person." The circuit court also noted that the Ver Velde brothers "don't know their uncle" and were manipulated by their father's deceptive conduct in filling their heads with false information about him. In finding the Ver Velde brothers' claims to be frivolous, the circuit court returned to the fact that "we brought in, as a witness, the poor realtor that was duped by Joe, just really shocking."

¶24 Jeffry's counsel and the circuit court continued to focus on Joseph's knowledge and conduct at a subsequent hearing on the sanctions issue. Jeffry's counsel stated that "there's a culprit here and unfortunately I don't think we can reach him. And that's dad, that's Joe Ver Velde." In order "to show [the court] the lengths that Joe [would] go to manipulate, deceive, and perpetrate fraud on this Court and on his brother[,]" counsel asserted that Joseph had "manipulated" his sons and accused him of suborning perjury from them. Following counsel's remarks, the circuit court began by stating that it did not "blame" the Ver Velde brothers' counsel "at all. It was absolutely Joe Ver Velde." The circuit court again faulted Joseph for obtaining an appraisal of Marilyn's house "through fraud and dishonesty[,]" stating that it "was clearly wrong and it was disrespectful to obtain that by fraud and then bring it into court." Regarding testimony given by several of the Ver Velde brothers about the heirloom ring that Marilyn had given to Jeffry's wife, the circuit court stated that the brothers could not have testified about Marilyn's gifting of the ring "because they didn't know that that had happened" and that it was a "[v]ery, very

terrible thing what the father had done to make up these things and somehow get the boys involved in this."

¶25    The circuit court did find that one of the Ver Velde brothers provided a "clearly … ridiculous" explanation as to why Joseph and four of his sons showed up to Marilyn's house with a truck after her death. But the circuit court's decision to sanction the Ver Velde brothers rested primarily on: (1) its findings concerning Joseph's intentionally deceitful conduct; (2) their failure to present evidence to support their claims at trial; and (3) the circuit court's sense that the Ver Velde brothers (except one who was a minor) "are old enough to know better, that they should not have brought these actions."

¶26    We do not believe that these considerations are sufficient to support the imposition of sanctions here. The circuit court's belief that Joseph had intentionally misled his sons does not justify sanctioning the sons. Both the circuit court and Jeffry's counsel expressed the view that the Ver Velde brothers had been manipulated by their father. The circuit court did not make specific findings of fact to support its conclusion that the Ver Velde brothers knew or should have known that the information and documents their father supplied to support the claims against Jeffry lacked merit. The evidence showed that the Ver Velde brothers, who had never met Jeffry prior to this lawsuit, had legitimate questions about Jeffry's handling of Marilyn's assets. The Ver Velde brothers raised questions about the absence of Marilyn's jewelry on the Inventory that Jeffry first filed, which led to Jeffry filing an Amended Inventory accounting for the jewelry. Indeed, the circuit court specifically found that Jeffry had omitted assets from the original inventory. Although the circuit court ultimately attributed the omission to "mistake or inadvertence" on the part of Jeffry, that does not mean that the Ver Velde brothers' litigation was frivolous. Similarly, the failure to present proof sufficient to prevail

12

on their claims at trial does not mean the filing and litigation of their claims was frivolous. Had the circuit court found the Ver Velde brothers to be credible and Jeffry to not be credible, this case could have resolved quite differently. Accordingly, we reverse and vacate the portion of the order finding these actions to be frivolous and imposing sanctions. Any sanctions that have already been paid shall be refunded.

¶27 For these reasons, we affirm in part and reverse in part. We award no costs to the parties.[8]

*By the Court.*—Order affirmed in part and reversed in part.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[8] To the extent we have not addressed an argument on appeal, the argument is deemed rejected. *See State v. Waste Mgmt. of Wis., Inc.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147 (1978).